Argued November 13, 1968, reversed February 26, 1969

SPRAGUE ET AL, *Respondents, v.* STRAUB ET AL, *Appellants.*

451 P. 2d 49

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Randall B. Kester,* Portland, argued the cause for respondents. With him on the brief were William D. Rutherford, Portland, and Maguire, Kester & Cosgrave, Portland, and Fred H. Paulus, Salem.

Thomas C. Enright, Salem, filed a brief as amicus

curiae for Oregon State Employees Association, Oregon Education Association, and Oregon School Employees Association.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LANGTRY, Justices.

O'CONNELL, J.

This is a declaratory judgment suit brought to test the validity of Chapter 335, Oregon Laws 1967 (now ORS 293.701-293.990 which we shall hereafter refer to as the Act) relating to the investment of public funds and other funds in the custody of officers of the state. Each of the plaintiffs allege that they have an interest in the funds. Defendants are the five members of the Oregon Investment Council which was created by the Act. They appeal from a decree declaring the Act unconstitutional.

The State Treasurer, as a member of the investment council, is designated by the Act as the investment officer for the council. ORS 293.726 (1) establishes the so-called prudent man rule as the general standard of judgment and care in the making of investments under the Act,[1] subject to the following qualification set out in ORS 293.726 (2):

"(2) Notwithstanding subsection (1) of this section, only moneys in the Public Employes' Retirement Fund and Industrial Accident Fund may

---

[1] ORS 293.726 (1) provides in part that in making investments there "shall be exercised the judgment and care * * * which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital."

be invested in the stock of any company, association or corporation, and not more than 10 percent of the moneys in each of those funds may be invested in common stock."

ORS 293.736 (1) specifies the investment duties of the "investment officer" (State Treasurer), which is qualified by ORS 293.736 (2), as follows:

"(2) The investment officer may not perform functions specified in subsection (1) of this section with respect to investment in common stock of moneys in the Public Employes' Retirement Fund or Industrial Accident Fund. Those functions with respect to that investment may be performed only by persons contracted with by the council as provided in ORS 293.741."

ORS 293.741 provides, in part, that:

"The council may enter into contracts with one or more persons whom the council determines to be qualified, whereby the persons undertake, in lieu of the investment officer, to perform the functions specified in ORS 293.736 to the extent provided in the contract. * * *"

The foregoing section is qualified by Section 19 of the Act (unnumbered in ORS and carried as a temporary section), which reads as follows:

"The Oregon Investment Council may not enter into any contract as provided in section 10 [ORS 293.741] of this Act for investment of moneys in the Public Employes' Retirement Fund or Industrial Accident Fund in the stock of any company, association or corporation and those moneys may not be invested as provided in sections 1 to 17 of this Act [ORS 293.701 to 293.776] unless prior thereto there has been rendered a final decision of the Supreme Court of Oregon affirming the validity of that investment. The council may petition the Supreme Court for a declaratory judgment un-

der ORS chapter 28 as to the validity of that investment and the Supreme Court has power under ORS chapter 28 to determine that validity and render and enter the appropriate declaratory judgment."

Plaintiffs allege that defendants have threatened to commence operations pursuant to the provisions of the Act, and that among other things defendants are about to enter into a contract for the investment of the Industrial Accident Fund and the Public Employes' Retirement Fund in common stocks of corporations. Plaintiffs contend that the Act violates various articles of the Oregon Constitution. We shall first consider the contention that the Act violates Article XI, § 6, which provides as follows:

"The state shall not subscribe to, or be interested in the stock of any company, association, or corporation, but as provided by law, may hold and dispose of stock, including stock already received, that is donated or bequeathed."[2]

It will be noted that this section does not directly prohibit the purchase of corporate stock by the state; the proscription is in the form of a direction to the state not to *subscribe* to stock and not to be *interested* in the stock of any company. The distinction between a subscription to stock and a purchase of stock is well established. The term *subscription* is ordinarily used to refer to an agreement to purchase stock in a prospective corporation to be organized in the future; it is to be contrasted with the purchase of the stock of an existing corporation.[3]

---

[2] The first part of the section was a part of the original constitution adopted in 1859. The clause permitting the holding and disposing of stock donated to the state was added in 1956.

[3] See Astoria & S.C.R. Co. v. Hill, 20 Or 177, 25 P 379 (1890); Commercial State Bank v. Eilers, 124 Or 379, 264 P 452 (1928).

The section goes on to prohibit the state from being "interested" in the stock of any company. This could mean that the state was not to acquire any form of proprietary interest in stock. It could have been employed to mean something less than an outright restriction on the ownership of an interest in stock in all circumstances. Thus it may have been intended only to restrict the state from having an interest in the stock in the sense of having a concern for the financial welfare of the corporation issuing the stock.[4]

We mention these possible meanings because there is evidence that Article XI, § 6 and similar constitutional provisions in other states were adopted not to prohibit investments in stock of any corporation no matter how sound, but to prevent the state from employing state moneys to aid companies which were entering into new and risky ventures. The historical background of constitutional provisions of this type has been described as follows:

"Early in the nineteenth century it seems to have been the general practice of states to encourage the building of railroads by permitting the state or a subdivision thereof to purchase stock in railroad corporations, to issue bonds or lend credit in aid of railroads, or to make outright donations to them. However, due to the large number of insolvencies of railroads, caused by frauds or economic conditions, states and subdivisions thereof found themselves largely indebted, and were themselves occasionally insolvent because of large investments in such enterprises. Therefore a reversal of policy set in. As early as 1851 Ohio adopted a constitution containing a provision prohibiting stock subscriptions or other forms of aid to corporations. In the ensuing twenty-five years most of the other

[4] The definition of the verb "interest" in Webster's Dictionary is "to interest oneself in another's behalf" or "to involve the interest or welfare of."

states adopted similar provisions, either prohibiting aid altogether or requiring a vote of the people before a subscription to stock or other sort of aid could be made or extended. At present, at least thirty-eight states have such constitutional provisions, and several have statutory provisions on the subject." Annot., 152 ALR 495-496 (1944).

Courts in some states, in construing constitutional provisions similar to the first part of Article XI, § 6, have turned to the historical setting in which these provisions were adopted and have confined the constitutional restriction to those expenditures or investments by the state which are designed to foster and promote private enterprises as distinguished from the mere investment of state moneys in well established companies. In this regard we find the case of *Johns Hopkins Univ. v. Williams*, 199 Md 382, 86 A2d 892 (1952), particularly helpful because it throws light upon that part of Article XI, § 6 which prohibits the state from being "interested in the stock of any company." In construing a Maryland constitutional provision, which was the same as that found in the New York constitution, the court explained that the basic reason for their adoption was that "[d]uring the second quarter of the 19th Century, these two states, as well as others, had given millions of dollars of state funds in the promotion of privately owned railroads and canals. It was a period of great expansion of internal improvements such as these, and what was done turned out to be a reckless and improvident use of public funds." (199 Md at 388).

The specific manner in which the state participated in these private ventures is explained as follows:

"* * * An illustration of the method used may be found in Chapter 170 of the Laws of New

York of 1836, which authorized the issuance of $3,000,000 worth of state certificates of stock to the New York & Erie Railroad Company. This stock was called 'The New York & Erie Railroad State Stock,' and the faith and credit of the State was pledged for the payment of interest and redemption of the principal. The company was authorized to sell the stock at public auction, the tolls and income from the use of the road were pledged to the payment of the interest, and the company was directed to make provision for the punctual redemption of the principal. In Governor Bouck's message of 1843, he said that, at that time, the credit of the state, amounting in the aggregate, to $5,235,700, had been loaned to [railroad companies]." *Johns Hopkins Univ. v. Williams*, 199 Md at 389, 86 A2d at 895.

This illustration shows how a state may become "interested in the stock" of a company, not because of an ownership interest in the stock of the company but because the state participates in issuance of the stock, permits its name to be used on the stock certificate, and pledges its credit for the payment of the obligation incurred upon the sale of the stock.

If we read this historical setting into Article XI, § 6, it would provide, in effect, that the state shall not subscribe to or be interested in stock *in aid of* any company. Where the term "in aid of" is expressly incorporated into a constitutional provision similar to Article XI, § 6 the provision has been given the limited interpretation suggested above. Thus in *Utah State Land Board v. Utah State Finance Com'n.*, 12 Utah2d 265, 267, 365 P2d 213, 214 (1961), the court said:

"The provision 'in aid of any railroad' etc., was expressly intended to prevent the use of the finances of the State to give support to private interests or enterprises, but unless the element of

aiding such an enterprise is present, there is no indication in the language of the Constitutional provision itself, nor in the background of its origins, that the State or its agency should be prohibited from the purchase of well-established corporate securities in the interest of prudent handling of the funds defendant is required to manage. The activating purpose makes the difference."

Similarly in *Almond v. Day*, 197 Va 782, 792, 91 SE2d 660, 667 (1956), construing a similar provision, the court said:

"* * * When the purchase of corporate securities, *i.e.,* bonds, stock or other obligations of a company is made with State funds which are being invested in the ordinary course of business for the State's benefit, and the transaction is not activated or made with the purpose of aiding in the construction or maintenance of the works of a company, such purchase is not forbidden by § 185. We find nothing to indicate that the resolution of the Board that authorized purchase of the bonds was adopted for the purpose of aiding any company in constructing or maintaining its work of public improvement."

Although the constitutional provisions interpreted in the foregoing cases express the prohibition in terms of the use of state funds "in aid of" corporations, the absence of such language does not preclude a similar construction.[9] The same meaning can be found by implication from the circumstances under which the constitutional provision was adopted—circumstances in-

---

[9] The Virginia Constitution interpreted in Almond v. Day, *supra,* prohibited the use of state funds "for the purpose of aiding in the construction or maintenance of its work." The court said that in the absence of such a clause the prohibition against the use of state funds would be complete and would prohibit investment in the stock of any company. We would not agree with this interpretation.

dicating that the purpose of the provision as originally drafted was to do no more than prohibit the state from joining with private entrepreneurs in the initiation and promotion of new and risky enterprises. Therefore, if we were called upon to interpret Article XI, § 6 as it read at the time of its original adoption in 1859 and without reference to any other interpretative factors, there would be some basis for the conclusion that the state is not prohibited from investing in the stock of established corporations.

But the interpretation of Article XI, § 6 requires the consideration of two other factors. We consider first the amendment adopted in 1956. This amendment adds to Section 6 the language "but, as provided by law [the state] may hold and dispose of stock including stock already received that is donated or bequeathed." This amendment was proposed by House Joint Resolution No. 11 in 1955, obviously in response to an opinion of the Attorney General, 26 Op Att'y Gen 15 (1952), that the State Board of Higher Education could not hold stock donated to it. In explaining the purpose of the proposed amendment the Official Voters' Pamphlet for 1956, at p. 11, stated that "Section 6, Article XI of the Oregon Constitution now forbids the State to own any interest in the stock of any company, association or corporation." If the state had the right to *purchase* stock, it would also have the right to receive *donations* of stock and there would have been no necessity for the amendment. But this does not tell us what motivated the people to adopt the amendment. A voter might well have voted for the amendment even if he had concluded that the then existing constitutional provision authorized the purchase of stock and that therefore the amendment was unnecessary. On the other hand, a vote for the amend-

ment could be interpreted not only as an approval of the amendment but also as a ratification of the view that the state is prohibited from purchasing stock (even though that view might have represented a misconstruction of the original constitutional provision).

A second factor must be considered in attempting to interpret Article XI, § 6. A companion provision relating to the use of public funds by counties, cities and other municipal corporations is found in Article XI, § 9, which was also adopted in 1859. This section reads in part as follows:

> "No county, city, town, or other municipal corporation, by vote of its citizens, or otherwise, shall become a stockholder in any joint company, corporation or association, whatever, or raise money for, or loan its credit to, or in aid of, any such company, corporation or association. * * *"

Even if one were to take into account the historical background to which we have referred above, it would be difficult to read Section 9 as having any other meaning than an absolute prohibition against the purchase of stock by counties and municipal corporations.[6] So construing Section 9 we are unable to think of any reason why the people would want to prohibit the purchase of stock by a county or city and yet allow the state to do so. If, then, Section 6 and Section 9 are read together, the failure to expressly refer to stock ownership in Section 6 could be explained simply as inartful draftsmanship. It is more likely that neither of these sections were drafted by the framers of our constitution but were borrowed from the con-

---

[6] But see, Dade County, Florida Board of Public Instruction v. Michigan Mutual Liability Co., 174 So2d 3 (Fla 1963).

stitutions of other states.⑦ If Section 6 and Section 9 were borrowed from different constitutions, the disparity in the language of the two sections could be explained as the product of a scissors and paste method of writing a constitution.

■ Putting together all of the evidence and factors bearing upon the meaning of Article XI, § 6 we have concluded, not without difficulty, that Article XI, § 6 constitutes a general prohibition against the purchase of corporate stocks by the state of Oregon.⑧

Defendants argue that even if Article XI, § 6 is construed as prohibiting the purchase of stock by the state, the provision is not applicable to the purchase of stock with money from the Industrial Accident

---

⑦ The wording of Article XI, § 6 is identical to the wording of Article XIV, § 8 of the Michigan Constitution of 1850. Article XI, § 9 appears to have been patterned after Article VIII, § 6 of the Ohio Constitution of 1851 which, when originally adopted, read as follows: "The general assembly shall never authorize any county, city, town or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or loan its credit to, or in aid of, any such company, corporation or association." Except for the form of the directive this language is identical to the 1859 version of our own Article XI, § 9. "Joint stock company" was changed to "joint company" by the 1917 amendment to § 9.

For evidence of the influence of the Ohio Constitution of 1851 and the Michigan Constitution of 1850 on the drafting of Article XI of our own Constitution, see Carey, The Oregon Constitution, 480 (1926).

⑧ The constitutions of four other states prohibit the state's *subscribing to or being interested in* stock. *Calif. Const.*, Art. XII, § 13; *Mich. Const.*, Art. XI, § 19; *Nev. Const.*, Art. XIII, § 9; *Wash. Const.*, Art. XII, § 9. Of these states, Michigan has assumed its section is an absolute prohibition of state investment in stock, and Attorneys General in Nevada and Washington have reached similar conclusions. Michigan Savings & Loan League v. Municipal Finance Comm., 347 Mich 311, 79 NW2d 590 (1956); Nev. Op. Att'y. Gen. 197 (1-13-1965); Wash. Op. Att'y. Gen. No. 51-53-218 (1952). California amended its constitution on November 8, 1966, to authorize investment in certain stocks on the assumption that investment in stock was previously prohibited.

Fund or from the Public Employes' Retirement Fund for the reason that the state has no proprietary interest in these funds and therefore stock purchased with money from them would not be owned by the state.

We shall first consider defendants' contention in relation to the Industrial Accident Fund. ORS 656.634 provides as follows:

> *"Trust fund status of Industrial Accident Fund.* (1) The Industrial Accident Fund is a trust fund exclusively for the uses and purposes declared in ORS 656.001 to 656.794, except that this provision shall not be deemed to amend or impair the force or effect of any law of this state specifically authorizing the investment of moneys from the fund.
>
> "(2) The State of Oregon declares that it has no proprietary interest in the Industrial Accident Fund or in the contributions made to the fund by the state prior to June 4, 1929. The state disclaims any right to reclaim those contributions and waives any right of reclamation it may have had in that fund."

The foregoing statute was interpreted in *Bennett v. State Ind. Acc. Com.*, 203 Or 275, 279 P2d 655, 886 (1955) where the question presented was whether a claim for workmen's compensation against the Industrial Accident Fund was a claim against the state within the meaning of Article XV, § 7 of the Oregon Constitution which prohibits a legislator from acting as an attorney "in the prosecution of any claim against this state." In that case plaintiff was represented by a lawyer who was a member of the Legislative Assembly. After referring to "the state's renunciation of any interest in the fund" through the enactment of ORS 656.634, the court went on to say:

> "* * * It must be entirely clear today that no claim or judgment against the State Industrial

Accident Commission can be paid out of any moneys belonging to the State of Oregon or affect 'an interest of value in a material sense to the state as a distinct entity.' An action against the commission is in effect a proceeding to have a certain portion of a trust fund administered by the commission but in which the state has no interest appropriated to the satisfaction of an injured employee's claim for compensation under the provisions of the Workmen's Compensation Law. It is not an action against the state." 203 Or at 280-81.

The court alluded to *Butterfield v. S.I.A.C.*, 111 Or 149, 223 P 941, 226 P 216 (1924), which held that the state was not a party to cases initiated before the Industrial Accident Commission and therefore could not appeal from a judgment of the trial court involving a claim under the Workmen's Compensation Act. The *Butterfield* decision was accurately abstracted by this court in *United Contracting Co. v. Duby*, 134 Or 1, 292 P 309 (1930):

"* * * In dismissing, upon the motion of the workman, this attempted appeal this court pointed out that the industrial accident commission is a corporation vested with express power to sue and to be sued and that it administers funds derived almost exclusively from employers and employees. In other words, the judgment of the circuit court was payable out of funds of which the state was custodian, but possibly not owner; the funds had been gathered not for the general enrichment of the state but for the benefit of injured contributing employees." 134 Or at 11.

The *Butterfield* decision noted that the state's interest in the Industrial Accident Fund was akin to its interest in the fund of the State Board of Agriculture. (111 Or at 153.) *Tongue v. State Board of Agriculture*, 55 Or 61, 105 P 250 (1909) had held that "the

State Board of Agriculture is a corporation, but is not a branch of the state government, nor for the administration of state affairs. It is not accountable to the state for moneys received by it in entries, gate money, or license fees, or any of its receipts except the legislative appropriation." (55 Or at 63.)

In *United Contracting Co. v. Duby, supra,* it was held that a judgment could not be obtained against the State Highway Commission without the state's consent. The court contrasted the Industrial Accident Fund as described in the *Butterfield* case and the funds disbursed by the State Highway Commission. The distinction between the two funds is brought out in *Bennett v. State Ind. Acc. Com., supra,* as follows:

"'* * * The basis of the holding in the United Contracting Co. case is that the funds disbursed by the State Highway Commission are public funds in possession of the state treasurer and any judgment rendered in that case would be paid out of such funds. The Butterfield case was distinguished on the ground that the fund administered by the State Industrial Accident Commission, and out of which a judgment would be paid, was 'somewhat remotely removed from the general assets of the state available for the discharge of its common debts.'" 203 Or at 277-78.

The foregoing cases taken together establish the proposition that the Industrial Accident Commission Fund is "a trust fund" which the State Treasurer holds only as a "custodian" and that the state "has no interest" in it. Although in these cases the character of the fund was examined either in relation to the question of the immunity of the state from suit, or in relation to the applicability of Article XV, § 7, the conclusion that the state has no proprietary interest in the fund would apply equally to the case before us

involving the authority to invest the fund in corporate stocks.

We have reached a similar conclusion with respect to the Public Employes' Retirement Fund. It too possesses all the characteristics of an isolated fund which made possible the results reached in the cases discussed above.[9] Paraphrasing the language quoted from *United Contracting Co. v. Duby, supra,* we may say that the retirement funds have been gathered not for the general enrichment of the state but for the benefit of contributing employees.

Since the state has no proprietary interest in these funds we can narrow the scope of the question before us as follows: Does Article XI, § 6 prohibit the purchase of corporate stocks by the state out of funds owned by others which it holds as trustee or custodian for a designated purpose?

Plaintiffs argue that "a constitutional prohibition intended to protect public moneys from the vagaries of the stock market ought to apply with even greater force to moneys held by the state or its agencies in a fiduciary capacity." This argument is valid only if it can be said that it was the intention of the people in adopting Article XI, § 6 not only to avoid the loss of the state's assets but also to pronounce, in effect,

---

[9] ORS 237.271 (2) declares that "the State of Oregon *and other public employers*" have no proprietary interest in the Public Employes' Retirement Fund and purports to disclaim on behalf of all public employers any right of reclamation they may have in the fund. (Emphasis supplied.) Plaintiffs contend that the legislature is without power to make such a disclaimer as far as it affects public employers other than the state. It is not necessary to consider the validity of this contention because even without a disclaimer the public employers cease to have a proprietary interest in the fund after they have made their contributions to it. The fund then becomes, in effect, a trust fund with the beneficial interest vesting in the participating employees.

the state's duty as trustee in dealing with the property of others.

■ We find nothing in the history of the various constitutional provisions in Oregon and elsewhere relating to the investment of state funds or the pledging of the state's credit indicating a concern for any losses other than those which would result in a diminution of state-owned assets. The fact that the fund which the state holds is administered as a part of a law which affects the public at large is not enough to make the fund "public" and thus entitle it to protection. This thought is brought out in *Bennett v. State Ind. Acc. Comm., supra,* by the adoption of the following quotation from 49 Am Jur 304, 305, States § 92:

> " '* * * It seems that the rule which forbids a suit against state officers because in effect a suit against the state applies only where the interest of the state is through some contract or property right, *and it is not enough that the state should have a mere interest in the vindication of its laws, or in their enforcement as affecting the public at large or the rights of individuals or corporations*; it must be an interest of value in a material sense to the state as a distinct entity.' " 203 Or at 278-29. (Emphasis added.)

The state's custodianship of the Industrial Accident Fund is not essential to the operation of a workmen's compensation plan; the objectives of the workmen's compensation law could also be accomplished under a system by which coverage was provided through private insurance. The retirement program could also be handled in this manner. There is no reason to assume that the people in adopting Article XI, § 6 intended the state, when acting simply as an insurance carrier in the administration of the fund, would be subject to any more stringent restrictions

with respect to the investment of the fund than those applicable to a private insurance company.

It must be admitted that a loss resulting from the investment of the fund in corporate stock could affect the financial interest of the state. If the fund suffered such a loss, it is possible that the legislature might think it advisable to reimburse the fund although not legally obliged to do so. And if the loss to the accident fund were made up through an increase in the rates of employers the state as a contributing employer would suffer a part of the loss. Likewise, losses in the retirement fund might be made up through increased employer contributions. But in such case the state suffers the loss, not as a state but as an employer and the loss does not result from the investment of its own funds but from the investment of money belonging to others. If the Workmen's Compensation Act and Public Employes' Retirement Act had provided that contributions were to be made to a trustee other than the state, it would seem clear that the interdiction found in Article XI, § 6 would not apply to the trustee even though the state as an employer would suffer a loss if the trustee's investment in stocks diminished the fund. The case is no different where the state itself elects to be the custodian of the fund.

■ We are of the opinion that the people intended the prohibition in Article XI, § 6 to apply only to funds owned by the state and not to funds which the state has expended and for which the state has received a quid pro quo, as it does when it receives coverage for its employees through its contributions as an employer to these funds.

We do not mean to suggest that Article XI, § 6 can be circumvented simply by the transfer of state moneys

to a trustee who is granted the power to invest in corporate stocks. In that case the state would continue to have the beneficial ownership of the fund and would be subject to the constitutional prohibition. But that is not the situation we have before us. The state's custodianship of these funds is not a device to circumvent the constitution; it is set up to implement a workmen's compensation plan and a retirement plan. Moreover, as we have pointed out, the state has no beneficial ownership of any part of these funds, in this respect having no different standing than other contributing employers.

There are few cases in other jurisdictions bearing upon the question before us. *Bolen v. Board of Firemen, Etc.*, 308 SW2d 904 (Tex Civ App 1958), although not precisely in point, contains reasoning similar to that which we have employed. In that case a statute authorized a pension board to invest pension funds of firemen and policemen in corporate stocks. The fund was held by the city treasurer and was administered by a board composed of the mayor, two city councilmen, two firemen and two policemen. In holding that the statute authorizing investments in corporate stocks did not violate the Texas Constitution prohibiting the state or any county, city or town from loaning or pledging its credit to any individual or corporation, the court said:

> "It is true that the city pays money into this trust fund, but once it is paid into the fund the city loses control over it and it no longer belongs to the city. The law just happens to name the mayor and two councilmen as members of the Board, but it might just as well have named someone else. The fact that the mayor and two councilmen happen to be members of the Board does not make the trust funds property belonging to the

city. The City Treasurer just happens to be named as ex officio treasurer of the pension fund, but this fact, again, does not give the city, as such, any control over the funds or make them city property." 308 SW2d at 905.

The same idea is expressed in *Wallace v. Childers,* 198 Okla 604, 180 P2d 1005, 1007 (1947).

These cases express essentially the same point of view as that taken in *Bennett v. State Ind. Acc. Comm.,* *supra,* and fortify our conclusion that Article XI, § 6 is not violated by the investment of moneys from the Industrial Accident Fund and the Public Employes' Retirement Fund in corporate stocks.

Plaintiffs also contend that Section 19 of the Act violates the separation of powers principle pronounced in Article III, § 1 of the Oregon Constitution. Plaintiffs interpret Section 19 to mean that this court is required to pass upon the validity of each investment proposed to be made by the Investment Council out of the Industrial Accident Fund and Public Employes' Retirement Fund which, it is argued, "would require the Judicial Department to exercise executive functions and to render non-judicial advisory opinions."

■ We do not so interpret the Act. It is our opinion that Section 19 was intended to require this court to make only one ruling having general applicability on the question of the validity of investing money from the two funds in corporate stocks. The question which the Legislative Assembly sought to have answered by the procedure set out in Section 19 was raised by plaintiffs' suit against defendants in this case, and since the question has been answered in disposing of the issues raised on appeal the question of the validity of Section 19 is moot.

■ The other questions raised by plaintiffs either are without merit or are unnecessary to the disposition of this case.[10]

The decree of the trial court is reversed.

---

[10] Plaintiffs argue that §§ 28 and 30 of the Act authorize the State Treasurer to invest the proceeds of state bonds in state office buildings in violation of ARTICLES XI-A, XI-E, XI-F(1), and XI-G. We need not reach this question at this time since there is no allegation that the State Treasurer is about to make such investments.