Honorable John Koster State Representative, 39th District P. O. Box 40600 Olympia, Washington 98504-0600
Dear Representative Koster:
By letter previously acknowledged, you have asked for our opinion on the following question:
 May the state investment board invest funds in the Washington Advanced College Tuition Payment Program Account in the custody of the state treasurer in stocks and bonds of private companies, associations, or corporations, such as equities, without the constitution being amended to allow such investments?
 BRIEF ANSWER AND SUMMARY OF ANALYSIS
We answer your question in the affirmative. The state constitution limits the state in certain ways with regard to the investment of state funds. These limitations have not been held to apply to purely private funds managed by the state. Although the state has agreed to appropriate monies for the tuition program if investments in the program fall short of the monies needed, this expenditure of monies is within the Legislature's authority to furnish a recognized governmental service, publicly funded higher education. Furthermore, the Legislature has enacted safeguards designed to minimize the risk of loss of public funds.
 ANALYSIS
We begin with a description of the advanced college tuition program[1], which is the subject of your question. The program was created by the 1997 Legislature (Laws of 1997, ch. 289) and is codified as RCW 28B.95. The overall purpose of the statute is to permit families[2] to make advance purchases of college tuition for students in future years. An eligible purchaser may enter into a contract agreeing to purchase one or more "tuition units" for an eligible beneficiary, to be redeemed in a future year for an equal number of tuition units, regardless of any increases in the price of tuition occurring in the interval. RCW 28B.95.030. Tuition units must be purchased at least two years before redemption and may be redeemed at any institution of higher education. Id.
Units may be redeemed for undergraduate education at a state institution for the "face value" of the units purchased, or they may be redeemed for graduate education or for education at a non-state institution for a cash amount calculated pursuant to the statute.[3] Id. The program is governed by a committee on advanced tuition payment.Id.
Payments made into the program are refundable. If the eligible beneficiary dies or is disabled without using the tuition credits purchased, or if the beneficiary completes education without using all of the credits, or receives scholarships, making it unnecessary to use the credits purchased, full refunds are generally available. RCW 28B.95.110. In other cases, there is a financial penalty for withdrawal. Id. The refund is based on the current weighted average tuition and fees at the time the refund is requested. Id.
When an eligible purchaser enters into a contract to purchase tuition units, the purchase price is placed in an advanced college tuition payment program account pursuant to RCW 28B.95.070. Funds in the account are to be invested by the state investment board using a standard of judgment set forth in RCW 43.33A.140. RCW 28B.95.070(1). The investment board is directed to "routinely consult and communicate with the governing body on the investment policy, earnings of the trust, and related needs of the program". RCW 28B.95.070(5). The assets of the account may be spent, without appropriation, to make payments to institutions of higher education on behalf of the qualified beneficiaries, or for refunds, transfers, and other lawful transactions involving the fund. RCW 28B.95.060(3).
The governing body of the program (the committee referred to earlier) is directed to make an annual evaluation of the actuarial soundness of the account to determine if additional assets are needed to defray the obligations of the account. RCW 28B.95.080. If funds are not sufficient, the committee is directed to adjust the price of subsequent tuition credit purchases to ensure its soundness. Id. If there are insufficient numbers of new purchases to ensure the actuarial soundness of the account, the committee is directed to request additional funds by appropriation from the Legislature. Id. If the program proves not to be financially feasible, the state reserves the right to discontinue it, with provision for honoring units purchased but unused at the time of discontinuation. RCW 28B. 95.090.
The Legislature has agreed to appropriate funds, if necessary, to meet any shortfall between the money in the account and the state's contractual obligation to fund tuition credits. This obligation is set forth in RCW 28B.95.050:
 The Washington advanced college tuition payment program is an essential state governmental function. Contracts with eligible participants shall be contractual obligations legally binding on the state as set forth in this chapter. If, and only if, the moneys in the account are projected to be insufficient to cover the state's contracted expenses for a given biennium, then the legislature shall appropriate to the account the amount necessary to cover such expenses.
 The tuition and fees charged by a state institution of higher education to an eligible beneficiary for a current enrollment shall be paid by the account to the extent the beneficiary has remaining unused tuition units for the appropriate school. The tuition and fees charged to a beneficiary for graduate level enrollments or by a nonstate institution of higher education shall be paid by the account to the extent that the beneficiary has remaining weighted average tuition units.
Id. Thus, the state has agreed to guarantee that an eligible beneficiary will be able to redeem the tuition credits purchased, either in the form of education at a state institution or in the form of a cash payment in the amount set forth in the law. There is a possibility, of course, that investment of the account will not produce sufficient income to meet anticipated increases in the cost of college tuition. By the language cited above, the state will appropriate monies to meet any shortfalls.
RCW 28B.95 does not explicitly authorize the investment of the advanced tuition payment program account in the stocks or securities of private companies. However, such authorization can be inferred from the language of the statute. As noted above, RCW 28B.95.070(2) provides that the account will be invested by the state investment board "with the exercise of that degree of judgment and care pursuant to RCW 43.33A.140 and the investment policy established by the state investment board". RCW43.33A.140, in turn, provides as follows:
 The state investment board shall invest and manage the assets entrusted to it with reasonable care, skill, prudence, and diligence under circumstances then prevailing which a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an activity of like character and purpose.
The board shall:
 (1) Consider investments not in isolation, but in the context of the investment of the particular fund as a whole and as part of an overall investment strategy, which should incorporate risk and return objectives reasonably suited for that fund; and
 (2) Diversify the investments of the particular fund unless, because of special circumstances, the board reasonably determines that the purposes of that fund are better served without diversifying. However, no corporate fixed-income issue or common stock holding may exceed three percent of the cost or six percent of the market value of the assets of that fund.
Id. (emphasis added). The underscored language shows that the Legislature expected, and impliedly authorized, that funds subject to this statute might be invested in corporate fixed-income issues or common stocks.[4]
This feature of the program leads to your questions. You express concerns about the authority of the investment board to invest the account in question in common stocks and other equities of private companies, given limitations in the state constitution on the use of public funds. You cite two provisions of the state constitution. First, article VIII, 5:
 The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.
Id.[5] A similarly worded provision is found in the constitutional article relating to private corporations:
 The state shall not in any manner loan its credit, nor shall it subscribe to, or be interested in the stock of any company, association or corporation.
Const. art. XII, 9. Your question is whether these two provisions place a limitation on the investment options that otherwise might be available to the investment board under RCW 28B.95.070.[6]
In analyzing the Legislature's power to direct how money in the advanced college tuition payment account may be invested, we begin with the fundamental principle that the power of the Legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state or federal constitutions. Stateex rel. Heavey v. Murphy, 138 Wn.2d 800, 982 P.2d 611 (1999); Brower v.State, 137 Wn.2d 44, 969 P.2d 42 (1998), cert denied, 119 S. Ct. 1498
(1999). The courts have found that a party challenging the constitutionality of a legislative act must demonstrate it is unconstitutional "beyond a reasonable doubt". Heavey, 138 Wn.2d at 808. This standard is met if "argument and research establish that there isno reasonable doubt the statute violates the Constitution". Id.
(citations omitted) (emphasis in the original).
In our opinion, the arguments in favor of applying the constitutional restrictions to the advanced college tuition account are not sufficient to overcome the presumption in favor of reasonable legislative acts. The question is a close one, however. There is no significant body of Washington case law to assist in analyzing the issue. The courts of other states are divided in their general approach to the issue, and there are no cases analyzing programs that are factually similar to the advanced college tuition credit program. The purpose behind the adoption of article VIII, 5 and article XII, 9 in the state constitution is not clearly articulated, making it more difficult to predict how it would be applied in these circumstances. Furthermore, the program in question contains some features which would support arguments that the constitutional limits should apply, as well as features supporting arguments to the contrary.
The Washington cases extensively analyze the extent to which state and local governments may lend credit or make gifts of public funds to private concerns, but do not address the separate issue of state interests in corporate stock as such. The recent case law would indicate that the advanced college tuition credit program does not involve a lending of credit as that term is defined in article VIII, 5 of the constitution. The term has been defined as the "use of government funds to benefit private interests under circumstances where the public interest is not being primarily served". CLEAN v. State, 130 Wn.2d 782, 928 P.2d 1054
(1996), as amended (1997). In the only Washington case involving the investment of funds purely to provide a rate of return, with no secondary purpose such as education or public welfare, the state Supreme Court found that the constitution was not violated by purchasing certificates of deposit in a financial institution, even though the private institution might gain incidental benefit from the purchase. State ex rel. Graham v.City of Olympia, 80 Wn.2d 672, 497 P.2d 924 (1972); accord AGO 1993 No. 8.[7] Concluding that the program presents no "lending of credit", we turn to the question whether the "interest in stock" provisions in article XII, 9 independently prohibit the investment of the advanced college tuition credit account in corporate stocks and equities. On this issue, we proceed without significant Washington case law guidance.
We consider three possible arguments why the prohibition on stock interests might apply to the program in question: (a) that the prohibition extends to the investment of public funds; (b) that the prohibition covers those programs where the state bears a risk of loss; and (c) that the prohibition covers any funds managed by the state, regardless of fund ownership or risk of loss.
A. Ownership Of Funds
The first question is whether the funds to be invested in connection with the advanced college tuition program are public funds or private funds. If public funds are involved, the plain language of the constitutional provisions cited appears to prohibit the investment of such funds in corporate stocks or similar equities, since the result will quite clearly give the state an interest in the stocks of private corporations. However, we would not understand RCW 28B.95 as providing for the investment of state (or other public) funds. The original 1997 version of the statute did not plainly characterize the account as either public or private in nature.[8] A 2000 amendment makes this characterization express:
 With regard to the assets of the account, the state acts in a fiduciary, not ownership, capacity. Therefore the assets of the program are not considered state money, common cash, or revenue to the state.
RCW 28B.95.060(4) (Laws of 2000, ch. 14, 5).
Even without this labeling by the Legislature, we would find that the account in question contains private, and not public, funds. First, no part of the fund derives from taxes, fees, or the use of governmental powers to obtain revenue for state use. Second, the state has no legal entitlement to use any of the money in the advanced college tuition payment program account unless credits are redeemed for a beneficiary attending a state institution, and funds are disbursed to the institution in payment for tuition. While the funds are in the advanced college tuition account, no state agency or institution has a right to use them. Third, until redemption, the funds are subject to refund pursuant to statute and to the terms of the contract between the state and the purchaser. Fourth, the program is entirely voluntary, and no person has any legal duty or obligation to purchase tuition credits. Those who do purchase them can analyze for themselves the costs and benefits, including any investment risks. These factors establish that the owners of the funds are the purchasers of the tuition credits, and the state's relationship to the account is not that of an owner, but that of a custodian or trustee.[9][10]
B. Risk Of Loss
The next question is whether the analysis changes, because the state guarantees that it will cover any shortfall between the money in the account and the actual future cost of college tuition. If an investment shortfall actually occurs, the state would then be contractually obligated to make up any shortfall between the money in the account and the current value of the tuition credits to which beneficiaries are entitled.
There are two ways to view this "guarantee". The first approach would view this guarantee as an exercise of the legislature's power to expend public monies for a recognized public purpose, i.e., higher education. The fact that it is exercising this legislative power in conjunction with a program that provides for the investment of private funds, and that the fewer private funds that are available will mean there will be a greater cost to the state in the exercise of that legislative power, does not mean the state is assuming a "risk of loss" of state funds. The expenditure of state funds for a public purpose is not a "loss" of state funds. The second approach would be to view the state as merely guaranteeing a certain level of return on private investment. In this view, the "risk of loss" analysis is important. Thus, we will analyze the state's role in the program under each of these approaches.
We believe the better argument is that the "risk of loss" analysis does not apply to the program at issue here. The advanced college tuition payment program was not enacted to assist corporations in obtaining capital, or to assist citizens in investing their money. The program has a very specific purpose: to assist the state's students in obtaining a higher education. RCW 28B.95.010. Higher education is a traditional, recognized purpose for the expenditure of state funds. Wash. HigherEduc. Facilities Auth. v. Gardner, 103 Wn.2d 838, 699 P.2d 1240 (1985).See also State Educ. Assist. Auth. v. Bank of Statesville, 276 N.C. 576,174 S.E.2d 551 (1970). The Legislature already subsidizes the education costs of students who attend state colleges and universities and could choose to increase its subsidies, even to the point of providing education at no charge to the students. If this fact is kept in mind, the advanced college tuition program can be analyzed not as a program in which private funds are invested with a state guarantee of a certain return, but as a contractual commitment to provide higher education to participating students, with an offer to provide such public funds as might be necessary to supplement the students' private contributions. In other words, the state's "risk of loss" is merely that the state will have to use public funds in a manner in which they could be used anyway.[11]
This approach is quite consistent with the leading case advocating the "risk of loss" approach. Marriage of Johnson, 96 Wn.2d 255, 634 P.2d 877
(1981), involved a challenge to a state statute authorizing the use of state funds and personnel to collect past due child support from delinquent parents. The court found that no "risk of loss" is relevant where the challenged program is for a recognized state purpose, such as the support of children. Although the case did not involve a stock investment issue, it recognizes, like the lending of credit cases cited earlier, that the purpose of legislation is often the key to its constitutional standing.
Under the second approach, where one views the "guarantee" as ensuring a return on private investment, the risk of loss of value in the account would have to be considered. The courts of other states have also struck down statutes based on language similar to that in our own constitution when they have found that there is a "risk of loss" of public funds.Gainer v. W. Va. Bd. of Inv., 194 W. Va. 143, 459 S.E.2d 531 (1995) (state pensions funds); W. Va. Trust Fund, Inc. v. Bailey, 199 W. Va. 463,485 S.E.2d 407 (1997) (a later statute commingling pension funds with other funds and placed under the management of a private trust); Bd. ofTrustees of the Pub. Employees Retirement Fund of Indiana (PERF) v.Pearson, 459 N.E.2d 715 (1984). But see Sprague v. Straub, 252 Or. 507,451 P.2d 49 (1969) (discussed below). These cases involved pension funds, which in both states were found to include significant use of public funds through the use of employer contributions. The program at issue here does not present the same features.[12] Because the investment of private funds and the related contingent commitment of public funds to cover shortfalls are incidental to the provision of higher education, we do not believe the courts would reach the "risk of loss" issue in analyzing it.
C. Applicability Of Limitation To Private Funds Managed By State
The inquiry does not end there, however. It leads to another question: do article VIII, 5 and article XII, 9 apply only to the state's management of its own funds, or do they also restrict the state from being interested in the stock of a private company where the state holds the stock in its capacity as a trustee or custodian of funds of others? Our courts have never addressed this question. We are persuaded by the reasoning of the Supreme Court of Oregon, which found that language virtually identical to our article XII, 9 did not apply to Oregon's management of its pension funds and workers compensation accounts, which that court considered private funds. While Washington courts could take a different view on the public or private nature of particular funds (such as worker compensation or pension funds), if it determined a fund were a private fund, the principle would be the same, that the constitutional provision does not apply to private funds held by the state. Here, we believe the Washington courts would view the tuition funds as private funds, and would further conclude the constitutional provisions do not apply to such private funds.
In Sprague v. Straub, the Oregon court determined first that constitutional provisions much like ours constituted "a general prohibition against the purchase of corporate stocks by the state of Oregon". Id., 252 Or. at 518.[13] However, the Oregon court went on to conclude that the state's industrial accident fund and its public employees' retirement fund consisted entirely of private money, of which the state was merely the custodian. Accordingly, the court held that the state of Oregon was free of the constitutional limitations in its investment of the two funds.
Although we are generally persuaded with Oregon's analysis, we note that our own courts have never specifically adopted it. In the two general areas covered by the Oregon decision, public pensions and industrial insurance, the Washington State Legislature sought and obtained the approval of the people for broader investment policies by proposing constitutional amendments. Article XXIX, 1. We took a cautious view in AGO 1984 No. 22, suggesting that a further constitutional amendment was the safest way to establish broader investment authority for industrial insurance funds.[14]
Past Legislatures have clarified their authority by obtaining explicit constitutional authority for broader investment of pension funds and industrial insurance funds.[15]
A similar amendment would remove all doubt with regard to investment of the advanced college tuition program account, but may prove to be unnecessary if the courts agree with this analysis.[16]
 CONCLUSION
The advanced college tuition payment program involves only investment of private funds, voluntarily contributed. The overall purpose behind the program is the support of education, and the state's commitment is closely tied to that overall purpose. Though there is a risk that public funds must be committed to meet the program's obligations, the risk is incidental to the provision of a well-recognized, traditional, and important state function. The program also bears little resemblance to the speculative economic ventures which occasioned the inclusion in the constitution of limitations on interests in the stock of private companies. All these factors lead us to conclude that the better arguments are in support of the constitutionality of the questioned investments. We therefore answer your question in the affirmative. Nevertheless, if the Legislature wishes to avoid uncertainty about the status of the investments, an additional amendment to the constitution would be the surest way to accomplish that goal.
Very Truly Yours,
JAMES K. PHARRIS Senior Assistant Attorney General
(360) 664-3027
JKP:pmd
[1] The program has been marketed as the "guaranteed education tuition" or "GET" program, although that phrase does not appear in the statutes.
[2] In fact, any individual or organization may purchase tuition units through the program for some student who may be eligible in the future to attend a state institution of higher education. RCW 28B.95.020(7) and (8). Organizations may purchase tuition units for future use as scholarships. RCW 28B.95.040.
[3] The tuition and fees charged to a beneficiary for graduate level enrollments or by a non-state institution of higher education are paid by the account to the extent that the beneficiary has weighted average tuition units remaining after any use of such units for education at a state institution. RCW 28B.95.050. Thus, units may be used for education at an institution not part of the state's system, up to the value of the tuition units when redeemed.
[4] The Legislature was specifically told, when considering the legislation which eventually became RCW 28.95B, that the program would involve investments in corporate stocks. One of the documents submitted to the Legislature was a report by the Higher Education Coordinating Board, which included a "First-Look" Actuarial Analysis of a prepaid tuition program. Washington State Higher Education Coordinating Board, Washington Advanced College Tuition Payment Program: Prepaid Tuition, 4, (1997). The analysis includes projections based on two different investment strategies: a "prudent but conservative" strategy based entirely on returns from fixed income investments such as bonds and a "more aggressive strategy" including participation in equities such as common stocks. Id. After cautiously concluding that either strategy might produce sufficient income to fund the proposed program, the report observes:
 The fixed income strategy, while sufficient for tuition payouts and administration, may not be sufficient to also permit the construction of adequate reserves to provide insurance against unforeseen investment shortfalls. The actual investment strategy will probably need to consider a mix of conservative and aggressive investment strategies to ensure a secure program.
Id. at 4.
[5] This provision, while worded somewhat differently, has been treated by the courts as if it were identical to article VIII, 7, a parallel provision relating to the money, property, and credit of local governments. See, e.g., City of Tacoma v. Taxpayers of Tacoma,108 Wn.2d 679, 702, 743 P.2d 793 (1987) (also see cases cited therein).
[6] You are not asking about the constitutionality of the statutes creating the advanced college tuition program, and thus we do not invoke our longstanding policy of declining to analyze, in an Attorney General Opinion, the constitutionality of a duly enacted statute. Rather, you have asked whether the constitutional limitations should be read together with the investment board's statutory duties, to allow the use of investments in stocks and other equities only specifically where the constitution has been amended to permit broader investment. As you note in your request letter, the constitution was amended in 1968 (Amendment 49, approved November 5, 1968) to permit investment of public pension or retirement funds as authorized by law. Const. art. XXIX, 1. This provision was further amended in 1985 (Amendment 75, approved November 5, 1985) to permit broader investment of the industrial insurance trust fund. A proposed amendment (SJR 8208) to add the state's emergency reserve fund to this section was rejected by the voters in the 1999 general election. Yet another amendment (SJR 8214) has been submitted by the current session of the Legislature for the voters to consider at the 2000 general election; it would allow the broader investment of trust funds held for the benefit of the developmentally disabled.
[7] Neither Graham v. City of Olympia nor AGO 1993 No. 8 concerned investments in corporate stocks. We cite them because the stock investment provisions in the constitution are intertwined with the "lending of credit" prohibitions contained in the same sections, and they are usually analyzed together.
[8] However, the 1997 law strongly implied that funds in the account were private. The statute is drafted in the language of a trust relationship implying investment for the benefit of some party other than the state. It uses phrases such as "purchaser" (RCW 28B.95.020(2) and elsewhere); "beneficiary" (RCW 28B.95.020(2) and (7)); "assets of the trust" (RCW 28B.95.030(6)); and "treasurer's trust fund" (RCW 43.79A.040
as amended by Laws of 1997, ch. 289, 13). The 1997 Legislature also specified that the money in the account would not be subject to appropriation. RCW 28B.95.060(3).
[9] It is beyond the scope of this analysis to consider whether common law trust principles govern the state's management of the account, or how.
[10] We recognize that with even slight variations in the way the program were operated, the funds might be held to be public in nature. This would be true if the Legislature reserved the right to use any of the funds in question, or commingled them with tax revenues and other clearly public funds, or treated the funds as simple advance tuition payments for future education at state-owned institutions. The Legislature appears to have avoided any of those features which would have made it necessary to consider the funds in the account to be public.
[11] This analysis does not completely answer the question because the program also allows participants in some circumstances to withdraw their funds. This is an incidental feature of the program, however, and the Legislature has sought to keep the program from merely becoming a private investment scheme. Credits are always redeemed at the current level of tuition in a state institution, making it clear that the program is not merely a scheme to invest private dollars. Except in unusual and justifiable cases, refunds are discouraged through financial penalties. Given these factors, it is clear that the statutes were enacted to assist Washington students in obtaining a higher education and not merely to put the state in the business of investing private citizens' funds.
[12] In any case, the Legislature has acted to substantially reduce the likelihood of a significant loss of public funds. First, all of the money deposited into the fund is private in origin, the purchase price of tuition credits received from individuals or organizations who voluntarily decide to purchase them. Second, as a practical matter, the state assumes the risk not that all of the funds in question will be lost, but merely that the amount in the account will not equal, at some future date, the then current value of tuition credits. Third, the state has protected itself against loss by requiring prudent and diversified investment, by adjusting the price of future tuition credits to increase revenue flowing into the account or, as a last resort, by reserving the option of terminating the program. These factors substantially reduce the chance that courts would find the guarantee alone requires treatment of the funds in the account as involving investment of public funds, rather than private funds.
[13] The opinion is candid in describing this as a close question, and it contains an interesting discussion of the intent behind the provision (common in state constitutions) prohibiting the investment of public funds in corporate stocks. The discussion suggests that the purpose was not so much based on a sentiment that stocks were a risky investment as on a sense of the impropriety of committing public funds to specific commercial ventures with private interests, such as railroads and land speculators. Sprague, discussion in 252 Or. at 512-18. We think the Oregon court is correct in suggesting that the constitutions of both states were written to restrict risky or foolish expenditures of public funds to support specific private ventures and not to prevent the prudent and widely diversified investment of public funds for the undeniably public purpose of realizing a reasonable rate of return in order to benefit the public treasury and relieve, at least to a limited extent, the necessity of raising taxes. Marriage of Johnson contains a discussion reflecting the view that the constitutional provisions in question were intended to prevent the use of public moneys in support of speculative and risky private ventures where the state not only bore the risk of loss but had no control over the enterprise. Id., discussion in 96 Wn.2d at 265-66.
[14] In AGO 1984 No. 22, we limited our analysis to the question whether the 1967 amendment for "pension funds" was broad enough to cover the industrial insurance fund. We found that it was not. The opinion does not analyze any argument concerning the public or private nature of industrial insurance funds. Although the opinion discusses cases from a number of states on both sides of the issue, it does not discuss or citeSprague v. Straub, the Oregon case decided about 15 years earlier.
[15] We will not here attempt to analyze the public versus private status of retirement funds or of industrial insurance funds. For investment purpose, article XXIX, 1 resolves any issues as to those funds.
[16] We will not here attempt to analyze the public versus private status of retirement funds or of industrial insurance funds. For investment purpose, article XXIX, 1 resolves any issues as to those funds.