[No. 37751.    Department Two.    September 29, 1966.]

KENNETH DENIKE et al., Respondents, v. CHARLES R. MOWERY et al., Appellants.*

*Reported in 418 P.2d 1010.

*Williams, Lanza, Kastner & Gibbs,* by *Joseph J. Lanza,* for appellants.

*Helsell, Paul, Feterman, Todd & Hokanson,* by *William A. Helsell* and *James T. Johnson,* for respondents.

FINLEY, J.—This appeal precipitates a confrontation between two apparently applicable principles of tort law, and necessitates either an accommodation of the two rules or a choice of one or the other. The first principle—and the one which ultimately prevails by virtue of the decision herein—is fundamental in the sense that it relates to the function of the law of torts. It is somewhat difficult to articulate, but may be stated in the following manner:

> Arising out of the various and ever-increasing clashes of the activities of persons living in a common society, carrying on business in competition with fellow members of that society, owning property which may in any of a thousand ways affect the persons or property of others—in short, doing all the things that constitute modern living—there must of necessity be losses, or injuries of many kinds sustained as a result of the activities of others. *The purpose of the law of torts is to adjust these losses and to afford compensation for injuries sustained by one person as the result of the conduct of another.* (Italics ours.) Wright, *Introduction to the Law of Torts,* 8 Camb. L. Rev. 238 (1944); quoted in Prosser, Torts 6 (3d ed. 1964).

The purpose of awarding nonpunitive, pecuniary compensation to the injured party is to repair his injury, or to make him whole again as nearly as that may be done by an award of money. McCormick, Damages, § 137 (1935). The conflicting or countervailing principle is that a release of the original tort-feasor operates in law to release the physician who negligently treats the injuries incurred in the original wrongdoing. See, *e.g., Martin v. Cunningham,* 93 Wash. 517, 161 Pac. 355 (1916); *aff'd en banc* 97 Wash. 699, 166 Pac.

793 (1917). *Strict adherence* to our prior decisions in some-
what analogous fact patterns (such as *Martin v. Cunning-
ham, supra*) would very probably have dictated a decision
in favor of the defendant physician herein. However, a
strong sense of justice plus a realistic, rational evaluation
of the facts and the pertinent principles and philosophy of
modern tort law require an affirmation of the trial court's
judgment entered on the jury's verdict for the plaintiff.

The fact pattern involved herein is relatively complicated.
For ease of reference, we have outlined the facts chrono-
logically:

*October 8, 1959 to March 30, 1960:*

On October 8, 1959, the plaintiff, Mr. Kenneth DeNike,
was injured in an automobile accident. He sustained severe
and permanent injuries, including nerve damage causing
loss of sense of taste and smell; a compound comminuted
fracture of the right femur, resulting in a permanent short-
ening of his leg; loss of sight in the left eye; a fracture of
the upper jaw; a depressed fracture of the nose, and frac-
tures through both cheek sinus with resulting depression
in the central portion of his face. The plaintiff hired Dr.
Charles Mowery (defendant-appellant involved in this
litigation), a specialist in plastic reconstructive surgery, for
treatment of his jaw and facial injuries.

Dr. Mowery commenced treatment of Mr. DeNike on
October 11, 1959, by reducing the jaw and nasal fractures
and attempting to reconstruct the depressed bridge of the
nose. During the course of these initial efforts to restore
Mr. DeNike's face, Dr. Mowery, during a procedure per-
formed on March 30, 1960, perforated the skin in an area
over the bridge of the nose while trying to replace its basic
foundation structure. This perforation never adequately
healed, and later, proved to be one of the principal sources
of adverse medical testimony during the course of this
subsequent malpractice action.

Meanwhile, Mr. DeNike had enlisted the services of an
attorney with reference to possible litigation over the
original automobile accident. At the attorney's request, Dr.
Mowery wrote a letter-report, dated November 18, 1959,

wherein he estimated that the entire restoration procedure would involve a period of approximately eight months. He further outlined the over-all techniques he would utilize in his treatment of Mr. DeNike by stating that the procedure would consist of a

> revision of the nasal bridge with *implantation of a graft* and infracturing of these displaced left nasal bones so as *to restore the line of the nose in the midline and to reproduce the relatively straight dorsal line of this man's nose as prior to the accident*. At a subsequent procedure after this had healed probably 8 months following injury a composite graft from one of the forward external ear rims could be transferred to the right nostril rim to restore this to a more normal balance with the non-injured left side. (Italics ours.)

On February 10, 1960, Mr. DeNike commenced an action against the original tort-feasor, one Melvin L. Bean, for all of the injuries sustained in the automobile accident of October 8, 1959, including the nasal, cheek, and jaw injuries for which Dr. Mowery had been retained as a specialist in reconstructive surgery. The record is clear that at the time of the commencement of suit against Melvin L. Bean Mr. DeNike was not aware—nor did he have reason to be aware—of any malpractice implications involving his treatment by Dr. Mowery.

*May 5, 1960 to November 16, 1960:*

During this period, Dr. Mowery performed eight separate procedures designed to repair the aforementioned perforation, repair the septum in the nose, and close all of the open wounds in the nasal area. Mr. DeNike began to have qualms about the progress of Dr. Mowery's work, and he sought assurance from Dr. Walter Brown, a plastic surgeon, on June 1, 1960, just prior to the moving of the upper right cheek flap by Dr. Mowery over the mid-line of the bridge. Dr. Brown testified at the trial that he told Mr. DeNike that "[Y]ou don't have to be concerned. You are going to a reputable, recognized plastic surgeon, who is also a good friend of mine. *And I suggest that you just let him handle it, and I am sure it will turn out all right.*" (Italics ours.)

This visit to Dr. Brown for "outside assurance," was of course unknown to Dr. Mowery. Mr. DeNike later testified that the horrible condition of his nose at the time was the precipitant for his solicitation of an opinion from Dr. Brown as to the quality and efficacy of Dr. Mowery's work.

The attorneys for the defendant in the automobile litigation took a pretrial discovery deposition of Dr. Mowery on August 25, 1960. Mr. DeNike and his attorney were present at that deposition, where Dr. Mowery stated that the cartilage graft which he had previously mentioned in his letter-report of November 18, 1959, would be inserted in approximately six to eight weeks. The general tenor of his remarks about the progress of the restoration of Mr. DeNike's face was optimistic, as demonstrated by the following excerpts:

> Q Now, on the completion of these procedures, what would you — what do you hope the end or net result will be? A Well, the efforts are primarily to restore as much as possible of his appearance and facial expression as before the accident. To make this in terms of a statistical analysis is impossible. I don't feel that discussing it in terms of saying 80 percent of his former nasal size is really a practical thing. *I would say that he will respond to this and gain a face which is satisfying to his security and business activities. There will be evidences of scarring which will not be invisible, but which will be acceptable and I think not disturbing, but visible.* Q I was going to ask you, would it be a better way to ask, if one hadn't met him before as, say, in my case, on meeting him a year from now, what, if anything, would I notice that would be out of the ordinary. A Some scarring of the nasal bridge and upper cheeks, inner cheeks, a tendency toward a so-called pug nose type of characteristic or diminutive, smaller nose, some instability or increased blood vessel pattern in the mid-two-thirds of the nose and inner cheeks, some deepening of the left orbit. *I think that is all—and a nice smile.* (Italics ours.)

By the close of the second chronological period designated herein, namely, November 16, 1960, Dr. Mowery had performed 11 separate surgical procedures on Mr. DeNike. It seems clear from the record that, although Mr. DeNike's

general appearance (and particularly his nose) had deteriorated rather than improved, Mr. DeNike had no reason to suspect negligent treatment. He had consulted another plastic surgeon and had been told to "allow Dr. Mowery's doing what he anticipated." Furthermore, Mr. DeNike had heard Dr. Mowery testify under oath that he would "gain a face which is satisfying to his security and business activities."

*November 16, 1960 to July 17, 1961:*

Although the trial of Mr. DeNike's suit against Mr. Bean was originally scheduled for October 18, 1960, it was continued, over objection by Mr. DeNike's counsel, until January 18, 1961. During that interim, Mr. DeNike was examined (upon the request of defendant Bean's counsel) by Dr. Carl Chism, another plastic surgeon practicing in Seattle. Dr. Chism made a written report of his findings. A copy of that report was given to Mr. DeNike's attorney prior to the scheduled trial date. The report, dated January 9, 1961, states in part that

the residual deformity is still very marked and major reconstruction of the nose will be necessary to produce either satisfactory appearance and/or satisfactory airways.

. . . .

In my opinion Mr. DeNike will never have a completely normal appearing nose. The basic contour of the nose and the breathing can be markedly improved, but fine contour of the nose, as badly damaged as this one, can never be replaced. It is my opinion he can be restored to a condition satisfactory for appearance in public and will be able to carry on his normal business satisfactorily.

The Chism report is in direct contrast to the optimistic predictions of Dr. Mowery in his deposition; but it is noteworthy that the report makes no mention of evidence of incorrect or negligent treatment by Dr. Mowery at the time of the examination by Dr. Chism (December 27, 1960).

Mr. DeNike eventually settled his claim against Mr. Bean by agreeing to the entry of a judgment against that defendant on January 18, 1961, in the amount of $21,140.00. It does not require any legal or medical expertise to ascertain

that the amount of settlement was appallingly low in view of the extensive pain and suffering, injury, and permanent disfigurement which Mr. DeNike had sustained. However, there was apparently some question as to the contributory negligence of Mr. DeNike; consequently, his attorney urged a settlement at the low figure. In order to make the settlement figure more attractive to Mr. DeNike, counsel sought and received a substantial reduction in fees from Dr. Mowery. Instead of having Mr. DeNike execute a release, counsel for Mr. Bean apparently insisted on a consensual entry of judgment—probably in order to avoid any question of a mutual mistake as to what was covered by the release.[1] At any rate, a consent judgment was entered in the amount indicated and was satisfied on the same date: January 18, 1961.

Dr. Mowery subsequently commenced a third series of reconstructive procedures in order to lengthen Mr. DeNike's nose preparatory to the insertion of the cartilage graft. Eight separate operations were involved during a period from February 13 to June 15, 1961. Mr. DeNike again sought reassurance from Dr. Brown (without the knowledge of Dr. Mowery) on February 17, 1961, and on July 17, 1961. On the latter date, Dr. Brown indicated to Mr. DeNike that it was his opinion that the nose was not yet ready for the implantation of the cartilage graft.

*August 10, 1961 to March 2, 1964:*

In spite of Dr. Brown's opinion, Mr. DeNike returned to Dr. Mowery for the cartilage graft procedure on August 10, 1961. The graft that was inserted was not successful. On October 31, 1961, Mr. DeNike transferred his care to Dr. Chism—the plastic surgeon who had previously examined him on behalf of Mr. Bean. Dr. Chism commenced a series of procedures designed to prepare Mr. DeNike's nose for the insertion of a second cartilage graft. The total reconstruction of Mr. DeNike's nose had not been completed

---

[1]See the cases annotated at 117 A.L.R. 1022 (1938) and 48 A.L.R. 1462 (1927).

as of March 2, 1964, the date on which trial began in the instant action.

Mr. DeNike commenced this malpractice action against Dr. Mowery on March 22, 1963. The complaint alleged that Dr. Mowery had negligently and carelessly performed at least 22 separate surgical procedures on the plaintiff's nose, all of which constituted a departure from the accepted standards of medical practice in the Seattle area. The complaint further alleged that the plaintiff had settled with the original tort-feasor as a result of the negligent assurances of Dr. Mowery that the plaintiff would recover from the facial injuries sustained by him in the original automobile accident, and that he would "gain a face which is satisfying to his security and business activities," and would be left with "acceptable" scarring on his face.

Dr. Mowery's answer denied that there was any negligence in the treatment of plaintiff and alleged as an affirmative defense the settlement effectuated by way of the consent judgment entered in the automobile litigation. Dr. Mowery contended that the judgment, and satisfaction thereof, operated to discharge him from any liability for the alleged negligent treatment of the facial injuries plaintiff suffered in the automobile accident.

The case was tried to a jury, which returned a verdict for the plaintiff for the sum of $60,000. Dr. Mowery has subsequently appealed from the trial court's entry of judgment on that verdict.

At the outset it may be noted that it seems rather apparent that at least some negligence was involved in defendant's treatment of the plaintiff. Three of the six plastic surgeons then actively practicing in the Seattle area testified on behalf of the plaintiff. Words are simply inadequate to describe the tragic results of the series of "abortive reconstructive" operations performed by the defendant on the features and the face of the plaintiff. However, the following pictures graphically portray the macabre results of 2 years of surgical work and at least 22 separate surgical procedures. The picture marked exhibit 21 shows Kenneth DeNike as he appeared before the automobile accident. Exhibit 12

is a photograph taken of the plaintiff after Dr. Mowery had performed the initial reduction of the nasal fractures. Exhibits 51B and 51C are pictures taken on November 28, 1961, shortly after DeNike had transferred his care to Dr. Chism.

Exhibit 21

Dr. Mowery's appeal is based principally upon the legal proposition that a release of the one responsible for the injury, the original tort-feasor, operates in law to release or discharge the physician who negligently treats the injury. *Adams v. Allstate Ins. Co.*, 58 Wn.2d 659, 364 P.2d 804 (1961); *Martin v. Cunningham*, 93 Wash. 517, 161 Pac. 355; and cases annotated at 40 A.L.R.2d 1075 (1955). The rule as stated, without amplification or qualification, would apparently preclude Mr. DeNike from recovering damages from Dr. Mowery in view of the consent judgment entered in the original automobile litigation on January 18, 1961. But we are convinced that such an inflexible application of an abstract legal proposition would produce manifestly un-

just results in fact patterns such as the one before us. Common-sense justice is, of course, the most desirable objective inherent in the application of any legal concept; and where the application of a legal concept so clearly results in injustice, it is incumbent upon the courts to examine the concept and its applicability most carefully.

EXHIBIT 12

Some clarification of the appropriate legal terminology might be helpful. There is a distinction between a release and a satisfaction. A release is a surrender of a claim, which may be given for less than full consideration, or even gratuitously. A satisfaction occurs when the injured party receives full compensation for the harm inflicted. Prosser, Torts § 46 (3d ed. 1964). The consent judgment of January 18, 1961, was the vehicle chosen by plaintiff DeNike and defendant Bean to implement the *release* of Bean from all liability for DeNike's extensive automobile injuries. That judgment was "satisfied," or paid, as of the same date. But the term "satisfied" should in no way be read to imply that Mr. DeNike necessarily received full compensation

for the injuries received. In fact, it is readily apparent from the record in this matter that counsel for DeNike

EXHIBIT 51-B

EXHIBIT 51-C

was somewhat uncertain about the contributory negligence aspects of the automobile accident and was, therefore, more amicable to settlement negotiations. Furthermore, it does not require extraordinarily intuitive reasoning to ascertain that $21,140 *does not reflect full compensation* for the loss of an eye, the shortening of a leg, loss of the sense of taste and the sense of smell, and the extensive facial injuries which the plaintiff suffered.

As a further preliminary matter we should note that Mr. Bean and Dr. Mowery are not joint tort-feasors—if that term is properly used. There is an inference in some of our decisions that an original wrongdoer and the physician who treats the person injured by the wrongdoing are joint tort-feasors. See, *e.g., Richardson v. Pacific Power & Light Co.,* 11 Wn.2d 288, 316, 118 P.2d 985 (1941); and *Pinkham Lumber Co. v. Woodland State Bank,* 156 Wash. 117, 126, 286 Pac. 95 (1930), where *Martin v. Cunningham, supra,* is cited as authority for the proposition that the release of one *joint* tort-feasor by operation of law discharges the other. Neither the *Martin* case nor the instant appeal involves joint tort-feasors. Dr. Mowery was a successive or subsequent tort-feasor to the extent that his negligence aggravated the original facial injuries. This confusion in Washington and other American jurisdictions apparently arose because the treating physician and the original tort-feasor could be *joined* together as defendants in one cause of action; but the original wrongdoer and the treating physician are obviously not joint tort-feasors in the sense that they acted in concert; nor are they concurrent tort-feasors in the sense that the fault of either could have caused the whole harm suffered by the injured party. Prosser, Torts, § 46 (3d ed. 1955).

The determinative issue in this appeal is whether the release of an *original* wrongdoer (Mr. Bean) should necessarily release the *successive* wrongdoer (Dr. Mowery) who negligently treats the injuries originally inflicted in the automobile accident. There are many jurisdictions which would apparently answer the question in the affirmative. See, *e.g., Tidwell v. Smith,* 27 Ill. App. 2d 63, 169 N.E.

2d 157 (1960); *Sams v. Curfman,* 111 Colo. 124, 137 P.2d 1017 (1943); *Paris v. Crittenden,* 142 Kan. 296, 46 P.2d 633 (1935); and the cases annotated at 40 A.L.R.2d 1075 (1955). However, the modern trend in judicial decisions, and the alternative most favored by law review commentators, allows a recovery by an injured party in an action against the treating physician for malpractice even though the patient has settled his claim against the original tort-feasor. These jurisdictions submit to the trier of fact the question of whether the injured plaintiff intended to release the physician at the time of settlement and, furthermore, allow the trier of fact to decide whether the earlier settlement, in fact, compensated the injured plaintiff for the malpractice which accompanied treatment of the original injury.

The leading case in this respect is probably *Derby v. Prewitt,* 12 N.Y.2d 100, 187 N.E.2d 556 (1963), commented upon in 62 Mich. L. Rev. 1089 (1964) and 63 Colum. L. Rev. 1142 (1963). In *Derby,* the plaintiff was struck by a taxicab and suffered a broken leg. She relied on the treating physician's assurances that the fracture had properly healed when she settled with the cab driver. Subsequently, she discovered that the physician had been negligent in giving such assurance. A second operation was required, which ultimately resulted in the shortening of her leg. The New York court held that the decisive consideration is whether the settlement constituted, or was intended to constitute, full compensation for her injury and is a proper question for the trier of fact.

The defendant-appellant herein urges that such a rule cannot be applied to the instant facts, since the satisfaction of a judgment against the person liable for the whole harm should discharge any person who is liable only for a part of the harm. Restatement, Judgments § 95, comment c (1942). Thus, the defendant urges that there can be no question of fact with reference to what was intended to be covered by the judgment for $21,140 entered against Mr. Bean. The gist of his argument is that Mr. Bean was responsible for creating the risk that Mr. DeNike would be subjected to negligent treatment; that Mr. Bean was liable not only

for the original harm inflicted, but for any aggravation or new harm caused by negligent medical treatment. Since Mr. DeNike could have brought a claim against Mr. Bean for the "whole harm," Dr. Mowery argues that the satisfaction of a judgment against Mr. Bean discharged Dr. Mowery from any liability for harm which he might have inflicted.

We fail to see why entry of a consent judgment rather than the execution of a release should prevent us from adopting the *Derby v. Prewitt, supra,* rule. Such a result would be manifestly unjust. There is ample evidence in the record to the effect that Mr. DeNike agreed to the entry of the judgment in reliance upon the assurance of Dr. Mowery that he would gain a socially acceptable face. We think that he was entitled to rely on the treating surgeon in this respect. It is obvious that Mr. DeNike had some doubts about the quality of Dr. Mowery's work at the time of the entry of the judgment against Mr. Bean. But neither Mr. DeNike nor his counsel had any reason to suspect malpractice until some 5 months after the settlement. Mr. DeNike had even surreptitiously sought the advice and counsel of another plastic surgeon and had been assured by him that Dr. Mowery's prognosis and plan of treatment were correct. Mr. DeNike heard Dr. Mowery's optimistic evaluation of his case at the deposition by Mr. Bean's attorneys. While it may be true that the subsequent examination by a plastic surgery specialist chosen by Mr. Bean was more negative, Mr. DeNike was not aware, nor should he have been aware, of the malpractice of Dr. Mowery on January 18, 1961. Thus, there can be no question that the amount of the settlement—whether secured by a release or by a consent judgment—was not intended to cover the harm, or the risk of harm, of negligent treatment.

Therefore, we hereby adopt the rule that a release by an injured party of the one responsible for the original injury does not *of itself* preclude an action by the injured person against a physician or surgeon for negligent treatment of the injury. Frequently, it will be a question of fact as to whether the parties intended the release to be

full compensation for the plantiff's total injuries, including those aggravated or newly inflicted by negligent medical treatment. But in the instant case we are convinced that there is no question with regard to the intention of Mr. Bean and Mr. DeNike in this respect, since neither party was aware at that time of the malpractice negligence of Dr. Mowery and the consequent aggravation of the injuries of Mr. DeNike.

Our adoption of the *Derby v. Prewitt, supra,* rationale does not necessitate an overruling of the line of cases which have followed *Martin v. Cunningham,* 93 Wash. 517, 161 Pac. 355. In that case the settlement was clearly made with a view to covering all possible elements of damages. At the time of the release, the injured plaintiff had already suffered from the malpractice *and had employed another surgeon to remedy it.* Thus, the settlement was clearly intended to cover that portion of the original tort-feasor's liability. But in the instant case, the consent judgment could not possibly have been entered with a view to covering the damages incident to negligent treatment, since Mr. DeNike had no knowledge, nor should he have known, of Dr. Mowery's failure to comply with the standards of medical practice by Seattle specialists in reconstructive surgery.

The remainder of appellants' assignments of error concern the instructions given by the trial court. We are convinced that the trial court's instructions were a correct statement of the law, and that appellants' contentions as to alleged errors in the instructions given and alleged error in refusing to give certain requested instructions do not merit any further consideration or discussion.

■ We noted in the beginning of this opinion that this appeal posed a conflict between two principles of tort law. The first and prevailing principle emanates from the fundamental reason for awarding damages for wrongfully inflicted personal injury: that the injured person ought to be made as nearly whole as possible through pecuniary compensation. This principle is really the basic underpinning of all tort law. The conflicting rule in this instance —that the release of the original tort-feasor necessarily

and irreparably discharges the negligent treating physician—is contrary to the historical foundations of modern tort law if applied inflexibly. Those foundations are noted in 1 Harper & James, Torts at xxxix (1956), wherein it is stated:

> At the beginning of the twentieth century, we find the common law of torts, as developed over the centuries, reflecting certain basic social policies. These policies represent deep-rooted notions of fairness and justice in human relations which have gradually become crystallized into legal principles from the ethical, economic and political philosophy of the Anglo-American people. Policies thus evolved, in many ways, embody the aspirations and ideals of a culture with respect to the relations of one man to another in the community.

We conclude that the negligent physician should only be discharged from liability when the injured party has been compensated for the original injuries, as well as for those aggravated or initiated by medical treatment. The crucial question is what the parties intended to cover by the amount specified in the settlement. Where, as herein, they had no reason to consider the possibility of malpractice, the subsequently executed release (or entry of consent judgment) does not discharge the negligent treating physician.

The judgment of the trial court is affirmed.

ROSELLINI, C. J., DONWORTH, WEAVER, and HAMILTON, JJ., concur.