[No. 46752-8.   En Banc.   October 15, 1981.]

*In the Matter of the Marriage of* VIRGINIA LEE JOHNSON, *Petitioner, and* ANDREW C. JOHNSON, *Respondent,* THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Appellant.*

Kenneth O. Eikenberry, Attorney General, and Eric B. Watness and Bruce Clement, Assistants, for appellant.

*Johnson, Lane & Gallagher,* by *Joanne Henry* and *Thomas H. Oldfield,* for respondent.

*Don Herron, Prosecuting Attorney,* and *Stanley P. Wagner, Jr., Deputy,* on behalf of Washington Association of Prosecuting Attorneys, amici curiae for appellant.

UTTER, J.—RCW 74.20.040 allows the Department of Social and Health Services (DSHS) to collect past due child support for children not receiving public assistance. The Superior Court ruled the act violates Const. art. 7, § 1 (amendment 14) and Const. art. 8, § 5, and granted a summary judgment to a delinquent father. We disagree and accordingly reverse.

Andrew and Virginia Johnson were divorced in April 1975. Virginia retained custody of their youngest child, and Andrew was ordered to pay child support. When he failed to do so, Mrs. Johnson asked DSHS to institute collection procedures.

Pursuant to RCW 74.20.040, DSHS offers support enforcement services to children with court ordered support decrees. Participation in the program requires an initial $20 fee and a monthly payment of $10, or 10 percent of the support collected, whichever is less. WAC 388–14–315. These fees defray less than one–half the cost of the services. In fiscal year 1977–78, the program cost $983,089 to administer, the support collections amounted to $6,494,383, and the paid fees totaled $483,308. The federal government directly reimbursed the State for 75 percent of the remaining costs, 42 U.S.C. § 655(a)(1), reducing the State's net cost of administration to $124,945. As a result of the program, the State obtained $3,600,000 more in federal funds than it would have otherwise received, an amount equal to 5 percent of the total federal assistance to the State's welfare programs. 42 U.S.C. § 603(h).

At the time of her request, Mrs. Johnson's monthly income exceeded $1,000 and neither she nor her minor child was eligible for any public assistance. DSHS commenced

collection efforts by sending Mr. Johnson a notice of the debt and demanding payment of past–due support totaling $1,770. He resisted, filed a lawsuit, naming DSHS as a third party defendant, and requested a summary judgment which was granted on the ground that RCW 74.20.040 is unconstitutional.

■■ Mr. Johnson contends that RCW 74.20.040 violates Const. art. 7, § 1 (amendment 14) and Const. art. 8, § 5, in that the net cost of providing child support collection services is a gift of public monies for a private purpose. To prevail, he must demonstrate that statute's "invalidity beyond a reasonable doubt" and rebut the presumption that all legally necessary facts exist. *Bellevue v. State,* 92 Wn.2d 717, 720, 600 P.2d 1268 (1979); *State v. Primeau,* 70 Wn.2d 109, 111, 422 P.2d 302 (1966); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960). This court will sustain statutes whenever it can conceive any set of facts which support the statute's constitutionality, *see State v. J–R Distribs., Inc.,* 82 Wn.2d 584, 512 P.2d 1049 (1973); *Spokane v. Carlson,* 73 Wn.2d 76, 80, 436 P.2d 454 (1968), and will accept as a verity any legislative declaration of the statute's public purpose, unless arbitrary or unreasonable. *See Frach v. Schoettler,* 46 Wn.2d 281, 280 P.2d 1038, *cert. denied,* 350 U.S. 838 (1955); *State ex rel. Gray v. Martin,* 29 Wn.2d 799, 189 P.2d 637 (1948).

I

■ Const. art. 7, § 1 (amendment 14) provides:

All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only.

It requires that government expenditures further public purposes. *United States v. North Bonneville,* 94 Wn.2d 827, 621 P.2d 127 (1980); *State ex rel. Collier v. Yelle,* 9 Wn.2d 317, 115 P.2d 373 (1941). An expenditure is for a public purpose when it confers a benefit of reasonably general character to a significant part of the public. *Bonneville,*

at 834, quoting 15 E. McQuillin, *Municipal Corporations* § 39.19, at 31–32 (3d ed. 1970); *Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974).

The State argues that RCW 74.20.040 furthers several public purposes, and hence is constitutional. As evidence of these purposes, it points to the legislative declarations in RCW 74.20 and its companion chapter, RCW 74.20A. The alleged public purposes are: (1) ensure that provision is made for the children's "support, education, and training, to the end that they may grow up to be worthy and useful citizens", *Corson v. Corson,* 46 Wn.2d 611, 615, 283 P.2d 673 (1955); (2) keep children and their custodians off welfare and thus reduce the taxpayers' burden, RCW 74.20-.010; S. Rep. No. 96–336, 96th Cong., 2d Sess., *reprinted in* [1980] U.S. Code Cong. & Ad. News 1448; (3) reduce financial dependency and social delinquency, RCW 74.20.010; (4) reduce the "increasing workload of courts, prosecuting attorneys, and the attorney general", RCW 74.20A.010; (5) make the collection of child support more effective and efficient, since existing techniques have proven ineffective and thus have frustrated enforcement of court decrees, RCW 74.20.010; RCW 74.20A.010; and (6) discourage non-support generally. *See* S. Rep. No. 96–336, *supra*; Stouder, *Child Support Enforcement and Establishment of Paternity as Tools of Welfare Reform—Social Services Amendments of 1974, pt. B, 42 U.S.C. §§ 651–60 (Supp. V, 1975),* 52 Wash. L. Rev. 169 (1976).

Mr. Johnson challenges those stated purposes, arguing that the real purpose for the scheme is to confer a direct benefit to the child's custodian, in that she or he is able to use the State's resources to get the support decree enforced at a fraction of the cost of employing a private attorney. He, however, has produced no evidence which establishes that such was the actual, only, or even primary intent of the legislature; nor does he show that the scheme fails to fulfill any of the stated public purposes. Instead, he only alleges that the public benefits are speculative, intangible and secondary.

The evidence, on the other hand, suggests that the scheme is effective in achieving, at least, some of those public goals. *See* S. Rep. No. 96–336, *supra*; Stouder, *supra*. In fiscal year 1977–78, the net cost of the program was $124,945, and it resulted in support collections of $6,494,383. Also, it is estimated that without the program 10 to 50 percent of the participants would have gone on welfare.

Mr. Johnson, as did the trial court, seems to confuse article 7, section 1 with article 8, section 5. He erroneously believes that section 1 is violated because substantial private benefits are conferred. He fails to realize only some actual public benefit is necessary for section 1 purposes. *Bonneville, supra; Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974). Thus, because Mr. Johnson has failed to show beyond a reasonable doubt that the statute does not further any public purpose, its constitutionality for section 1 purposes must be presumed. *See Bellevue, supra; Clark, supra.*

Notwithstanding that, Mr. Johnson argues that some, if not all, of the alleged public purposes could be furthered by requiring the participants to pay the full costs of the program. At best, that allegation may be only partially correct, as many participants lack the resources to bear the full costs, and hence their collections would not be made without the reduced fee feature. *See generally* S. Rep. No. 96–336, *supra*; Stouder, *supra*. Moreover, it is conceivable that there may be instances where the actual collection costs exceed the amount collected. While that may not be cost effective in the short run, it may become very cost effective if it deters future nonsupport in that case as well as others.

Despite that, even if Johnson's allegation were correct, such does not render the scheme unconstitutional. So long as the program promotes a real public purpose, it is immaterial that it could accomplish the same end more efficiently. *See State Highway Comm'n v. Pacific Northwest Bell Tel. Co.,* 59 Wn.2d 216, 367 P.2d 605 (1961); *Ragan v. Seattle,* 58 Wn.2d 779, 364 P.2d 916 (1961).

## II

Const. art. 8, § 5 provides:

The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.

It prohibits the State from giving its money or property to any private entity.[1] *State Health Care Facilities Auth. v. Ray,* 93 Wn.2d 108, 605 P.2d 1260 (1980); *State Higher Educ. Assistance Auth. v. Graham,* 84 Wn.2d 813, 529 P.2d 1051 (1974). Impermissible gifts of property have been found where the State voluntarily and without any reciprocal consideration conferred a pecuniary benefit to an entity whose function was primarily private. *See, e.g., Louthan v. King County,* 94 Wn.2d 422, 617 P.2d 977 (1980); *Health Care Facilities, supra; Bellevue, supra; Bonneville, supra; Scott Paper Co. v. Anacortes,* 90 Wn.2d 19, 578 P.2d 1292 (1978); *Anderson, supra; State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 82 Wn.2d 265, 510 P.2d 233, 59 A.L.R.3d 1209 (1973); *State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 497 P.2d 924 (1972); *State ex rel. Tattersall v. Yelle,* 52 Wn.2d 856, 329 P.2d 841 (1958). Under two rationales, RCW 74.20.040 does not violate article 8, section 5.

### A

Article 8, section 5 does not prevent the State from exercising a "recognized public governmental function." *State v. Guaranty Trust Co.,* 20 Wn.2d 588, 592, 148 P.2d 323 (1944); *Morgan v. Department of Social Security,* 14

---

[1]Const. art. 8, § 7 extends the same prohibition to local governments. It reads:

No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

This court has stated that sections 5 and 7 contain similar restrictions, as well as exceptions, and implement nearly identical policies but with respect to different political entities. *Health Care Facilities,* at 115. Therefore, for the purpose of this opinion, cases applying either may be used.

Wn.2d 156, 127 P.2d 686 (1942). Recognized governmental functions are excepted because applying the constitutional debt limitations, such as article 8, section 5,

> would destroy the efficiency of the agencies established by the constitution to carry out the recognized and essential powers of government. It cannot be conceived that the people who framed and adopted the constitution had such consequences in view.

*Rauch v. Chapman,* 16 Wash. 568, 575, 48 P. 253 (1897). The public benefit achieved from such activities is the "consideration" for the funds expended. *State Highway Comm'n v. Pacific Northwest Bell Tel. Co.,* 59 Wn.2d 216, 227, 367 P.2d 605 (1961). Aid to the poor and infirm is one example of a governmental function, and hence it has been excepted from the section 5 prohibition. *Guaranty Trust, supra; Morgan, supra; Health Care Facilities, supra.*

■ Public enforcement of child support is a recognized governmental function. It has a historical and continuing basis in our law. As early as 1854, territorial courts were required to "make provision for the guardianship, custody and support and education of the minor children . . ." upon divorce. Laws of 1854, 1st Sess., § 8, p. 407. Similarly, beginning in 1919, county prosecuting attorneys could commence filiation proceedings. Laws of 1919, ch. 203, § 3, p. 711.

Since then, the State has been given the authority either to initiate or participate in many proceedings involving minor children. *See, e.g.,* RCW 26.09 (divorce and support proceedings); RCW 26.20 (criminal nonsupport and desertion); RCW 26.21 (uniform reciprocal enforcement of support act); RCW 26.26 (filiation). The State has been permitted to intervene in such proceedings, and hence to expend state monies, to protect several compelling interests. *State v. Meacham,* 93 Wn.2d 735, 741, 612 P.2d 795 (1980); *State v. Wood,* 89 Wn.2d 97, 102, 569 P.2d 1148 (1977). Those compelling interests include safeguarding the child's constitutional rights, protecting the taxpayers, and assuring that the primary obligation for child support falls

on the parents. *Meacham,* at 741; *Wood,* at 102. Of these, the "court's greatest concern is the welfare of the child and the protection of the child's fundamental right to support." *Wood,* at 102.

> Where minor children are involved, the state's interest is that, in so far as is possible, provision shall be made for their support, education, and training, to the end that they may grow up to be worthy and useful citizens.

*Corson v. Corson,* 46 Wn.2d 611, 615, 283 P.2d 673 (1955). *Accord, Fuqua v. Fuqua,* 88 Wn.2d 100, 558 P.2d 801 (1977).

To protect those interests, the State has been permitted to expend public monies even when the child is not receiving public assistance. *Fuqua,* at 108; *State v. Ozanne,* 75 Wn.2d 546, 452 P.2d 745 (1969). Such expenditures are justified because, in many cases, delaying until the child goes on welfare would irrevocably harm the State's interest. Once a child goes on public assistance, both the child and the taxpayers have already been harmed. *Cf. Fuqua,* at 108; *Ozanne, supra.*

As already shown, and as expressly declared by the legislature, RCW 74.20.040 creates a program to protect the State's interest in its children and its taxpayers. In determining the constitutionality of a statute, we accept the legislative declaration of purpose, unless it is arbitrary or unreasonable. *See Frach, supra; Gray, supra.* Mr. Johnson has failed to show beyond a reasonable doubt that the statute does not further those interests. *See Bellevue, supra; Primeau, supra.* Instead, the evidence shows that the program has been extremely effective in collecting child support and, at a minimum, prevents 10 percent of the participants from going on welfare. Although a more cost effective program may be conceivable, that does not render RCW 74.20.040 unconstitutional. *See Pacific Northwest Bell Tel. Co., supra; Ragan, supra.*

Accepting the legislative declaration of purpose, and in light of this State's historical and continuing involvement in matters of child support and custody, we believe RCW

74.20.040 furthers a "recognized public function" and, thus, is exempt from the strictures of article 8, section 5. Furthermore, as discussed below, it is not the type of program the constitutional framers intended to prevent.

## B

■ Judicial approaches should be reexamined when the court creates several technical exceptions to preexisting holdings or when the holdings are differently applied for no significant reason. *See deElche v. Jacobsen,* 95 Wn.2d 237, 247, 622 P.2d 835 (1981); *In re Stranger Creek,* 77 Wn.2d 649, 466 P.2d 508 (1970); *DeNike v. Mowery,* 69 Wn.2d 357, 418 P.2d 1010 (1966). The presence of inconsistent analyses or exceptions suggest the approach may have outlived its relevance or was improvidently fashioned. Our checkered approach to section 5 problems mandates a reexamination of this area.

We have used differing analyses in section 5 cases, often without explanation. For example, *Johns v. Wadsworth,* 80 Wash. 352, 354, 141 P. 892 (1914), declined to use a public purpose analysis. It stated:

> If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than corporate or public purposes, they would doubtless have said so in direct words.

*Accord, State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965); *State ex rel. Wash. Navigation Co. v. Pierce County,* 184 Wash. 414, 51 P.2d 407 (1935). In contrast, last year we "acknowledged that the existence of a public purpose in some instances can save a loan of credit from unconstitutionality . . ." *United States v. North Bonneville,* 94 Wn.2d 827, 838, 621 P.2d 127 (1980). *Accord, Japan Line, Ltd. v. McCaffree,* 88 Wn.2d 93, 558 P.2d 211 (1977).

As a corollary to the above, we traditionally rejected the "conduit theory." That is, if private parties directly received the State conferred benefit, it was immaterial that the public ultimately would be served. *Johns, supra; Moran*

*v. Thompson,* 20 Wash. 525, 56 P. 29 (1899). Nevertheless, recent cases have endorsed the theory.

The fact that private enterprise may be selected to effectuate the plan . . . [which the court found to constitute a public purpose] does not make the purpose . . . a private one.

*In re Port of Seattle,* 80 Wn.2d 392, 396, 495 P.2d 327 (1972); *see Health Care Facilities, supra.*

A third inconsistency is found in our use, until recently, of the "risk of loss" approach. *State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 497 P.2d 924 (1972); *Berglund v. Tacoma,* 70 Wn.2d 475, 423 P.2d 922 (1967). A statute or scheme did not violate section 5 unless the State's assets were subject to loss. Despite that, in *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974) and *Health Care Facilities, supra,* we stated there may be a constitutional violation though the State incurs no actual indebtedness.

More inconsistencies exist, but inasmuch as this court has never expressly overruled a previous section 5 case, all of the above approaches remain viable.

Examining this area of law can only lead to the conclusion that its evolution is contrary to the genesis of section 5. That provision, and ones similar to it, arose in the nineteenth century in response to reckless government subsidization of public and communication projects. *PUD 1 v. Taxpayers,* 78 Wn.2d 724, 726, 479 P.2d 61 (1971); *State ex rel. Graham v. Olympia, supra; Rauch v. Chapman,* 16 Wash. 568, 48 P. 253 (1897); Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach,* 111 U. Pa. L. Rev. 265, 277 (1963); Comment, *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis,* 41 U. Colo. L. Rev. 135, 136 (1969). State and local governments had purchased stock in such enterprises or acted as surety on issued bonds. 41 U. Colo. L. Rev., at 136; Pinsky, *supra* at 278–80; Note, *State Constitutional Limitations on a Municipality's Power To Appro-*

*priate Funds or Extend Credit to Individuals and Associations,* 108 U. Pa. L. Rev. 95, 97 (1959). These private ventures were highly speculative and many failed, leaving governmental entities, and thus the taxpayer, either holding worthless stock or liable for large, inadequately secured debts. *PUD 1, supra; State ex rel. Graham v. Olympia, supra*; 41 U. Colo. L. Rev., at 136; Pinsky, *supra* at 278.

The constitutional provisions were a response to two features of those schemes. Pinsky, *supra* at 280–81; 41 U. Colo. L. Rev., at 135. They jeopardized state assets and, secondly, the public lacked control over both the enterprise and the extent of the public's liability. These evils resulted in the creation of section 5. *See Journal of the Washington State Constitutional Convention 1889,* at 675, 679–84. In the debates surrounding section 5, the delegates denounced "government subsidization of private enterprise." *Journal,* at 681–82. Their disapproval was so great that they rejected a provision exempting those subsidies which served public purposes. *Journal,* at 683. They also vituperatively spoke of government entanglement with private enterprise and the public's inability to control any attendant liability. *Journal,* at 682.

After reviewing the origin of section 5, we think it is time to return to the theme of our earlier cases. The public purpose analysis is unacceptable not only because a proposed amendment to that effect was rejected at the convention, but also because it renders section 5 nugatory. At the time section 5 was enacted, the United States Supreme Court had already ruled that the Fourteenth Amendment requires state monies be spent only for public purposes. *See Citizens' Sav. & Loan Ass'n v. Topeka,* 87 U.S. (20 Wall.) 655, 22 L. Ed. 455 (1874); *Green v. Frazier,* 253 U.S. 233, 64 L. Ed. 878, 40 S. Ct. 499 (1920). Consequently, in creating section 5, the delegates must have envisioned another objective. *See* 41 U. Colo. L. Rev., at 139. Similarly, prior to section 5, several courts in other states, using the public purpose analysis, had approved of government subsidization. *See* 111 U. Pa. L. Rev., at 97; 41 U. Colo. L. Rev., at

139. Constitutional provisions in the nature of section 5 were therefore a response to that judicial approval and thus were intended to require more than a public purpose analysis. *See* 111 U. Pa. L. Rev., at 111; 41 U. Colo. L. Rev., at 139.

■ Our departure from the "risk of loss" approach is likewise unwarranted. The schemes which provided the impetus for provisions like section 5 all involved the actual loss of state assets through either stock and bond purchases or suretyship. At the time these provisions were adopted, "credit" was understood to be "[t]he correlative of a *debt*; . . . that which is incoming or due *to* one." Black's Law Dictionary 299 (1891); *see* Burrell's Law Dictionary 399 (1871). The nature of those nineteenth century schemes and that definition suggest that section 5 should prohibit only those activities which jeopardize state assets. Such was recognized in *Graham*. There, we stated:

> We believe, therefore, that the prohibition was against loans as used in the ordinary and popular sense, between a lender and a borrower, where a question of the security of funds in such transactions would be involved . . .
>
> . . .
>
> It was the risk of endangering public funds from the loaning of money in the ordinary and popular sense that the framers of our constitution interdicted . . . It would appear that if there are adequate protections for the security of such deposits from loss, the purposes and objectives of Const. art. 8, § 7, would unquestionably be fulfilled.

*State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 676–77, 497 P.2d 924 (1972). *Accord, Seattle & Lake Wash. Waterway Co. v. Seattle Dock Co.,* 35 Wash. 503, 77 P. 845 (1904). That also has been the conclusion reached in other jurisdictions. *See, e.g., Green v. Mount Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964); *Carruthers v. Port of Astoria,* 249 Ore. 329, 438 P.2d 725 (1968); *Uhls v. State ex rel. Cheyenne,* 429 P.2d 74 (Wyo. 1967).

■ Given the history and policy background on the credit lending provisions, we believe article 8, section 5 is

not violated. Not only does the statute further a "recognized public function," but with the support enforcement program the use of the State's assets and the extent of its liability are controlled by DSHS, a government agency. The individuals participating in the program simply receive a service; they neither personally expend state monies nor dictate their use. Also, DSHS determines who, if anyone, receives its services. *See* RCW 74.20.040. Currently, it provides services only to one–half the applicants. The program thus has safeguards absent in the schemes of the nineteenth century. The public controls both the use of the State conferred "asset" and the extent of its liability.

We therefore conclude that RCW 74.20.040 violates neither Const. art. 7, § 1, nor Const. art. 8, § 5, and accordingly reverse.

DOLLIVER and WILLIAMS, JJ., concur.

STAFFORD, HICKS, and DIMMICK, JJ., concur in the result.

BRACHTENBACH, C.J., dissents.

DORE, J. (dissenting in part, concurring in part)—The custodian of a minor may enlist the aid of the State Attorney General in securing support obligations which are due and owing. These support enforcement services are provided by the State regardless of the financial status of the custodian. RCW 74.20.040. Thus, even though a custodial parent earns a salary sufficient to comfortably support the household or even if such custodian is a millionaire or trustee bank, the State's services are available for a nominal fee.

Const. art. 8, § 5 reads:

> The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.

The words of the constitution are clear and unambiguous. The cost to the State of providing such support enforcement service constitutes giving the State's credit. A custodial parent is a private "individual" to whom the State's

credit may not be given.

This court has recognized an exception to the above quoted constitutional prohibition when the State's money is disbursed to needy and infirm individuals. *Morgan v. Department of Social Security,* 14 Wn.2d 156, 127 P.2d 686 (1942). Providing care for these individuals is a "recognized public governmental [function]". *State v. Guaranty Trust Co.,* 20 Wn.2d 588, 592, 148 P.2d 323 (1944).

Const. art. 8, § 5 will be violated if the State's coffers are used to enforce support obligations for custodial parents other than those who receive public assistance, or who would be forced onto the welfare roles if the delinquent support payments are not collected.

I agree with the majority that the scheme need not offend the constitution. Standards must be set and regulations promulgated by the secretary[2] so that custodial parents who are financially secure are not offered the State's funds. With such restriction, the enforcement services statutory scheme can be upheld as coming within the "aid to poor and infirm" exception to Const. art. 8, § 5's prohibitions.

The majority today upholds the support enforcement services statutory scheme by defining enforcement of child support obligations as a *new* "recognized public governmental function". Majority opinion, at 261.

I cannot agree with the majority that a recognized public governmental function is found whenever enforcement of support obligations are at issue. A closer look at the exception for the needy will clarify my position.

Const. art. 8, § 7 provides, in part:

No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, associa-

---

[2]RCW 74.20.040 also provides, in part: "The secretary may establish by regulation, such reasonable standards as he deems necessary to limit applications for support enforcement services. Said standards shall take into account the income, property, or other resources already available to support said person for whom a support obligation exists."

tion, company or corporation, except for the necessary support of the poor and infirm . . .

Generally, section 7 prohibits local entities from doing what section 5 prohibits the State from doing. One obvious difference between these two sections, relevant here, is section 7's express exception to the constitutional prohibition when the funds are used to aid the poor and sick. Although this court has refused to create an exemption to a constitutional prohibition where none is expressed, *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 806, 399 P.2d 623 (1965), judicial constitutional interpretation engrafted the "needy and infirm" exception onto section 5.

When article 8 was drafted, local governments were looked to as the appropriate source for welfare relief. In the wake of the Depression and consistent with the national trend, the state legislature shifted the responsibility for welfare relief to the State from the traditionally local arena. Shortly thereafter, this court carved out an exception to article 8, section 5, parallel to that found in the language of article 8, section 7. *Morgan v. Department of Social Security,* 14 Wn.2d 156, 127 P.2d 686 (1942). Although section 5 does not contain an express exception for "the necessary support of the poor and infirm", we have construed sections 5 and 7 as containing similar restrictions, similar exceptions thereto, and as implementing nearly identical policies with respect to different political entities.

*Washington Health Care Facilities Auth. v. Ray,* 93 Wn.2d 108, 115, 605 P.2d 1260 (1980). Relying on the holding in *Morgan,* that the State may lend its credit to the needy who are not sick, we held that the State may, likewise, lend its credit to the sick who are not needy. *Health Care Facilities.* The "poor *and* infirm" exception to section 5 thus became the "poor *or* infirm" exception. We illustrated our view of the government's role with the following example:

[I]t is only reasonable that our emergency medic units go to the aid of all persons in need of immediate medical attention without first inquiring as to their financial

> ability. To require that the infirm also be needy before they could receive any sort of assistance from the state or a municipality would be absurd in our opinion.

*Health Care Facilities,* at 116. The "recognized public governmental function" which established the "poor and infirm" exception to the prohibitions of section 5 in the context of the poor, was, through *Health Care Facilities,* extended to aid the infirm. The role of the government as provider to those in financial and medical need is not a new concept. Welfare relief is a public governmental function by definition. In some form or another, the needy must be aided by the State.

In contrast, however, is the State's interest in the support of minor children. That there is such an interest is beyond question. *Heney v. Heney,* 24 Wn.2d 445, 165 P.2d 864 (1946). Such interest is substantial, rising to the constitutional magnitude of "compelling". *State v. Meacham,* 93 Wn.2d 735, 738, 612 P.2d 795 (1980). At times, this interest has been transformed into authority for the State to become a party in actions where minor children are involved. In *Fuqua v. Fuqua,* 88 Wn.2d 100, 558 P.2d 801 (1977), the prosecuting attorney was found to have power to appear on behalf of the State when an attorney's lien threatened to diminish funds paid into the registry of the court which constituted, in part, child support arrearages. Although the court found such power inherent in the prosecutor's role as county attorney, *Fuqua,* at 102–03, certain statutory provisions also provided express authority for the State to step into cases involving support of minor children. *Fuqua,* at 103–04. The State's interest in the welfare of minor children was evident in *Meacham* where we held that the State may require, in a paternity suit, that the alleged father submit small amounts of blood for testing.

I do not question that the State has an interest in such cases. Further, this interest permits the State to intrude

when minors are involved. However, such authority is not absolute; a constitutional limit on the State's acts is found in Const. art. 8, § 5. The primary responsibility for child support resides with the parents. The State seeks to ensure that that support is forthcoming.

> When minor children are involved, the state's interest is that, in so far as is possible, provision shall be made for their support, education, and training, to the end that they may grow up to be worthy and useful citizens.

*Heney*, at 459; *Corson v. Corson*, 46 Wn.2d 611, 615, 283 P.2d 673 (1955). The majority allows the State to provide support enforcement services to custodial parents who have the means to provide for the minor child until the delinquent support payments are made. The State's interest in securing the support of minor children is satisfied when court action is taken to see that a judgment of support is enforced. The State may provide the means to effectuate such collection only when the custodial parent is "needy" as defined earlier.[3] In such case, the state constitution will not be offended, and the State's interest in seeing that minor children are cared for will be satisfied.

I fear that if this court holds the State interest at stake here to be a "recognized public governmental function", for the purposes of excepting the scheme at issue from the prohibitions of Const. art. 8, § 5, a dangerous precedent will be set. There are many State concerns. The State may not lend or give monetary support to certain recipients, however, merely because of the State's interest in the subject. In *Johns v. Wadsworth*, 80 Wash. 352, 141 P. 892 (1914), the question was the county's power to donate money to the Western Washington Fair Association, a private corporation organized to promote and arrange for the county

---

[3]*See* footnote 2. The secretary of the Department of Social and Health Services may require, for example, that the custodial parent file an affidavit which, in effect, states that without the State's help in enforcing the judgment, the parent will be forced onto the public assistance roles. The Attorney General may go behind such affidavit, if necessary, to determine the precise financial status of such parent.

fair. By statute, the county commissioners were to be made ex officio members of the Fair Association. This court quoted from an argument of counsel as follows:

"Whitworth college is almost on the point of being removed from Tacoma to Spokane, because it needs money. The college is a great public benefit to Tacoma, probably as much as the fair is to the county. What is to hinder the legislature from authorizing the city to supply the lacking funds, giving them subject to the condition that the mayor shall be *ex officio* a member of the college board of trustees, and that the college treasurer shall report annually how the money was spent? Many people think that one of the greatest institutions a city can have is a theater and auditorium; why not contribute ten or fifty thousand dollars to the construction of one, put a councilman or two on the board, and have a yearly account filed?"

*Johns*, at 355–56. The court found that allowing the donation would unconstitutionally lend the credit of the county. Under today's holding, we will be free to uphold the donation to the fair by declaring that such fairs are "recognized public governmental functions". We have been reluctant in the past to broaden our interpretation of the lending of credit provisions and I would not do so in the instant case.

In summary, I hold that the State Attorney General can provide legal counsel at State expense to aid a custodial parent in recovering past–due child support payments without violating Const. art. 8, § 5, provided that: (1) the custodial parent is receiving public assistance, or (2) there would be a real possibility the custodial parent would be forced onto the welfare roles if she or he would not be able to collect support payments. To ensure that the parent enjoying the support enforcement services is "needy", the secretary must establish guidelines to screen applicants as to their financial condition. I have suggested that a screening procedure may be in the form of affidavit wherein the custodial parent swears to his or her financial status. It is constitutionally impermissible to use the credit of the State to finance legal services for the financially affluent.

274

I would reverse and remand to the trial court for the purpose of determining the financial status of the custodial parent and for entry of judgment in accordance with the provisions of this opinion.

ROSELLINI, J., concurs with DORE, J.